UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| MICHAEL D. ADKINS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   No. 1:07 CV 72 PPS |
| | ) |
| MICHAEL J. ASTRUE | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**OPINION AND ORDER**

Michael Adkins's was denied Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) and he seeks review of that decision.  His claim for disability benefits relates to a back impairment that he had during the period of October 1, 2000, through May 30, 2005.  Following two hearings before an Administrative Law Judge, Adkins's application for benefits was denied on the grounds (among others) that he was capable of performing a substantial number of jobs in the national economy.  This decision is supported by substantial evidence, and so the decision of the Commissioner of the Social Security Administration (SSA) is affirmed.

**I.  BACKGROUND**

**A.** **Factual History**

Adkins is a 51-year-old man with a high school education.  (R. 79, 91.)  He suffers from pain in his back, hips, right leg and left arm caused by a pinched nerve and degenerative disc disease.  (R. 15, 85.)   Since 1979, Adkins has had a variety of unskilled and semi-skilled jobs in factories and warehouses. (R. 131.)  From October 2000 to May 2005, Adkins was employed sporadically; none of his jobs lasted more than five months.  (R. 111, 128.)  Adkins resumed

1

substantial gainful activity in June 2005 and was still employed as of the date of his appeal.  (R. 75, 287-90; DE 16.)  Adkins claims that he has been disabled since October 1, 2000; although this contradicts what he said in his application for disability benefits wherein he said that the onset date of his disability was October 2001. (R. 15, 75, 85.)

Adkins first sought treatment for shoulder pain in January 2002, from Dr. Thomas Ringenburg.  (R. 143.)  After initially treating Adkins with anti-inflammatory medication, Dr. Ringenburg referred Adkins to a neurosurgeon, Dr. Isa Canavati, for further evaluation.  (R. 87.)  Dr. Canavati diagnosed Adkins with a disc herniation and gave Adkins two options: conservative treatment with steroid injections or outpatient spinal surgery.  (R. 140-41.)  In August 2002, Adkins consulted with Dr. James Hanus.  (R. 161.)  Dr. Hanus concluded that Adkins had a ruptured lumbar disc and required spinal surgery.  (R. 148.)  Dr. Hanus certified to SSA that Adkins had significant limitations bending, squatting, crawling, climbing and making repetitive leg movements and moderate limitations sitting, walking, standing, lifting, pushing, pulling and doing normal housework.  (R. 149.)

On September 18, 2002, a state agency physician completed a Residual Functional Capacity (RFC) Assessment of Adkins.  Here were the limitations that were found: occasionally lifting 20 pounds; frequently lifting 10 pounds; standing, sitting or walking for six hours per day; unlimited pushing or pulling; and occasionally climbing, balancing, stooping, kneeling, crouching and crawling.  (R. 150-58.)  On October 25, 2002, a non-treating family practice physician completed a state vocational rehabilitation form indicating that Adkins was unable to bend or stand for long periods of time, recommending that Adkins avoid heavy lifting and stating that Adkins was "unable to work."  (R. 165-66.)

Also in October 2002, Adkins underwent a psychological consultation to evaluate his

2

vocational aptitude and capacity.  (R. 167-172.)  During this visit, Adkins reported that he was "pain free" although he experienced uncertainty about his job future and preferences.   (R. 169.)  Dr. Paul Martin concluded that Adkins's "scores predict easy success for him in unskilled and semi-skilled work," and that Adkins appeared "to be in quite good health." (*Id*).  He further concluded that Adkins "should be successful in many forms of skilled level occupations and business world/technical jobs of similar challenge."  (R. 171A.)  Dr. Martin recommended for Adkins "[r]apid involvement in vocational counseling, programming, and placement if at all possible."  (*Id.*)

On November 7, 2002, Adkins had laminectomy and discectomy surgery.  (R. 176-77.)  In December 2002, Dr. Canavati recommended that Adkins continue to be limited to a 30 pound lifting restriction for an additional month.  (*Id.*)  Five months after the surgery, Adkins continued to experience back pain and he started seeing a new family practice physician, Dr. Antonio Garrido. (R. 184.)  During his first visit with Dr. Garrido in March 2003, Adkins began complaining of depression.  (*Id.*)  Dr. Garrido treated Adkins's ongoing back pain with medication and also prescribed antidepressants.  (*Id.*)  Two months later, Adkins reported to Dr. Garrido that he was a chronic alcoholic.[1]  (R. 183.)  Dr. Garrido warned Adkins not to mix alcohol with his medications. (*Id.*)  He also referred Adkins to Dr. Kevin Rahn, an orthopedic surgeon, for his continued back pain.  (*Id.*)

On June 5, 2003, Dr. Rahn first met with Adkins; he ordered MRIs, and placed him on a lifting restriction of 25 pounds.  (R. 215.)  Two weeks later, after reviewing Adkins's MRIs, Dr.

---

[1] In July 2003, Adkins later reported that he had been drinking approximately 12 cans of beer per day for 20 years.  (R. 185.)  An electrodiagnostic study later concluded that some of Adkins's symptoms may have been related to his alcohol use.  (R. 203.)

Rahn diagnosed Adkins with degenerative disc disease. (R. 207, 209-12.) Dr. Rahn nonetheless changed his recommendation to "no work restrictions." (R. 208-12.) Further evaluation revealed a chronic radiculopathy, which is a non-specific nerve disorder. (R. 198.) Adkins was treated with a series of steroid injections between July 2003 and March 2004. (R. 173-175.) After the first injection, Adkins said he felt 75% better and that he was 95% better after his second injection. (R. 190-94.) By September 26, 2003, Adkins had also completed physical therapy and reported no pain problems except minimal tightness in his lower back and a low level of pain in his left bicep. (R. 227). Through March 18, 2004, Dr. Rahn consistently placed Adkins under "no work restrictions." (R. 194, 191, 188).

A few months later – in July 2004 – Dr. Rahn did an about face. Adkins's attorney had requested information from Dr. Rahn in relation to Adkins's disability benefits case. It was only then that Dr. Rahn recommended that Adkins be restricted to lifting 10 pounds or less, no significant bending or twisting, minimal overhead activities and changing positions from sitting to standing every 20-30 minutes. (R. 239-40.) Dr. Rahn further recommended that Adkins receive a functional capacity evaluation to further determine his restrictions. (*Id.*)

On May 2, 2005, Dr. Mark Zolman, a physiatrist from Dr. Rahn's practice, completed a Medical Source Statement regarding Adkins's ability to perform work-related activities, in which he restricted Adkins to lifting 10 pounds occasionally, less than 10 pounds frequently, and occasionally climbing, balancing, kneeling, crouching, crawling, and stooping. (R. 253-254.)

In June 2005, after three years of unemployment, Adkins began working full-time again as a paint collator. (R. 75-77, 287.) The job required him to push a four-wheeled cart around a 70-inch long table while stacking paint sheets and then lifting and carrying finished sets of sheets weighing 17 pounds. (R. 77.) Adkins remained employed throughout his proceedings before the

4

ALJ.  (R. 287-290; DE 16.)

    **B.**    **Procedural History**

On July 19, 2002, Adkins protectively applied for DIB alleging an ongoing disability as of October 1, 2000.  (R. 13.)  The claim was denied and Adkins requested a hearing. (*Id.*)  In the meantime, Adkins applied for SSI.  (*Id.*)  The SSI application was also denied and the hearing on the SSI claim was consolidated with Adkins's DIB claim. (*Id.*)  At the hearing, Adkins, his brother, and vocational expert (VE) Robert Bond testified. (*Id.*)

The ALJ asked the VE to consider whether jobs would exist in the national economy for someone who could not do constant or repetitive manipulation; could not lift and carry more than 30 pounds; and whose function would be largely right-handed with only mere assistance from the left hand.  (R. 277.)  The VE testified that such a person could not perform any of Adkins's past work, but that there would be other representative unskilled jobs in the economy such as a deed or account investigator (250 jobs in the local area), furniture rental consultant (300 jobs in the local area), and counter clerk (200 jobs in the local area).  (R. 278-79.)  Adkins's attorney also questioned the VE as to whether there would be any available jobs for someone who needed to recline for four hours a day with his feet raised, an additional limitation asserted by Adkins at the hearing.  (R. 280.)  The VE claimed that no jobs would exist with that additional limitation.  (*Id.*)

The ALJ denied Adkins's claim, finding that he was not disabled under the Social Security Act. (R. 50-59.)  The Appeals Council then remanded the case to the ALJ with instructions for the ALJ to explain the weight given to Dr. Rahn's opinion, to further evaluate Adkins's residual functional capacity for the closed period, and to obtain testimony from the vocational expert regarding the effect of Adkins's assessed medical limitations on his occupational base. (R. 45-46.)

A second hearing was held on August 11, 2006.  (R. 13.)  By then, Adkins had been

working full time for more than a year. (R. 290-91.) At the hearing, Adkins's counsel asked whether any jobs would be available to an individual of like age, education, and work experience who possessed the most recent limitations prescribed by Dr. Rahn, including: no lifting or carrying more than ten pounds; no significant bending or twisting; minimal overhead reaching; and changing positions every 20 to 30 minutes. (R. 292.) The VE responded that there would be no jobs available to someone who needed to change positions every 20 minutes. (R. 293.)

After the hearing, Adkins amended his claim to a closed period of disability of October 1, 2000, through May 30, 2005. (R. 23.) The closed period reflects the fact that Adkins returned to work full-time in June 2005 and thus was presumptively ineligible for benefits after that date. (*Id.*) On October 30, 2006, the ALJ issued a second decision finding that Adkins was not disabled during the closed period. (R. 13-21.) The Appeals Council later denied Adkins' request for review, and this appeal followed.

## II.  DISCUSSION

Adkins's two page appeal to this Court from the decision of the ALJ is a little difficult to decipher.  A clue to his principal concern can be found in his complaint where he says that the testimony of Dr. Rahn should have been enough to grant him disability.  That is therefore where I shall focus.  But first, some background: An applicant for disability insurance benefits must establish "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 404.1505.  The SSA's regulations prescribe the familiar five-step sequential inquiry for an ALJ to determine whether an applicant is disabled:  (1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that

6

the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether he can perform his past relevant work; and (5) whether the claimant is capable of performing any work in the national economy. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. § 404.1520, 416.920.

Adkins claims that the ALJ improperly evaluated the medical evidence in deciding to deny his application for disability benefits. (Compl. ¶ 10, DE 1.) He asserts that the medical evidence – particularly, the statement of Dr. Rahn, his orthopedic surgeon, and the x-rays and MRIs – is sufficient to show he was disabled during the closed period. (*Id.*) In reviewing the work of the ALJ, I cannot reweigh evidence, choose among conflicting versions of events, decide questions of credibility, or substitute my own judgment for the ALJ's. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Instead, my review is limited to determining whether the decision is supported by substantial evidence. *Rice v. Barnhart*, 384 F.3d 363, 369-70 (7th Cir. 2004). "Evidence is substantial if a reasonable person would accept it as adequate to support the conclusion." *Young*, 362 F.3d at 1001; *see also Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008).

Adkins easily met the first two steps in the five-step sequential process since he did not work enough during the closed period and was found to have a severe impairment by virtue of his degenerative disc disease. At Step Three, the ALJ is required to determine whether the applicant's impairment meets or medically equals all the criteria of an impairment in the SSA's Listing of Impairments. 20 C.F.R. § 404.1525; 20 C.F.R. Pt. 404, Subpt. P, App. 1. The ALJ found that Adkins was not disabled per se under the SSA's regulations because his impairment did not meet any musculoskeletal impairment on the list. (R. 16.) Specifically, the ALJ explained that the medical evidence showed that he was able to ambulate effectively without the assistance of any devices; he was able to use one upper extremity effectively for gross and fine movements; and he

7

did not suffer from loss of reflexes, motor strength, or sensation in his lower extremities after his surgery. (*Id.*)

Adkins's medical files do not contradict these findings; in fact, Dr. Rahn's treatment notes reflect significant improvement of pain-related symptoms following steroid injection treatments. In addition, the ALJ examined whether Adkins may have suffered from a mental impairment that grew out of his physical impairment. (R. 16-17.) The ALJ considered Dr. Martin's psychological assessment in October of 2002, Adkins' failure to independently seek a psychological diagnosis until well after the end of the closed period and the hearing testimony. (*Id.*) He concluded that Adkins's alleged depression was not a severe impairment during the closed period. (*Id.*)

In order to evaluate Steps Four and Five, the ALJ must first determine the applicant's Residual Functional Capacity (RFC), which is a measure of claimant's abilities to work despite his impairment. 20 C.F.R. § 404.1545. The determination of one's RFC is not a medical opinion, but rather an administrative finding based on the ALJ's evaluation of the record, including all relevant medical and non-medical evidence and the claimant's own statement of what he is able or unable to do. 20 C.F.R. § 404.1527; *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). When weighing medical opinions, the ALJ must consider, among other things, the examining relationship, treatment relationship, supportability of the opinion, and consistency with the record. 20 C.F.R. § 404.1527.

The ALJ concluded that, despite Adkins's impairment, he could lift 30 pounds occasionally and 10 pounds frequently; use his dominant right hand and arm frequently and his non-dominant left arm and hand as a helper; sit, stand or walk each for six hours per day. (R. 18.) The ALJ's RFC determination largely mirrors the state's RFC Assessment with two modifications. First, the state's RFC Assessment places no limitation on Adkins's use of his left arm. The ALJ added this

8

limitation because medical evidence showed that Adkins's left shoulder and arm did not respond favorably to the steroid injection treatment.

Second, the state agency physician certified in September 2002 that Adkins could lift a maximum of 20 pounds occasionally. The ALJ instead determined that Adkins could lift a maximum of 30 pounds during the closed period. The 30 pound weight restriction comes from Dr. Canavati's recommendation in December 2002 that Adkins should continue not to lift more than 30 pounds for an additional month following his surgery. (R. 176.) By June 2003, Dr. Rahn had determined that Adkins should still be limited to a 25 pound weight restriction. (R. 215.) The ALJ concluded that Adkins's RFC did include some lifting restriction during the closed period and gave greater weight to Dr. Canavati's recommendations because he was Adkins's treating neurosurgeon.

The ALJ explicitly discounted the recommendations of Dr. Rahn. After initially recommending a 25 pound lifting restriction, Dr. Rahn prescribed no work restrictions from June 2003 to May 2004. But, in July 2004 – just two months after saying there were no work restrictions – Dr. Rahn did a 180. He wrote a letter in anticipation of Adkins's hearing recommending that Adkins should be subject to a wide variety of stringent work restrictions including no lifting above ten pounds. The ALJ noted that Dr. Rahn's recommendations were inconsistent with Adkins's job responsibilities at the time of the hearing, the recommendations of other treating physicians, and also Dr. Rahn's own recommendations. (R. 19) Although Adkins urges the Court to consider Dr. Rahn's medical opinion as sufficient evidence of his work limitations, the ALJ was not required to adopt Dr. Rahn's medical opinion in light of these contradictions. *See Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007) ("An ALJ . . . may discount a treating physician's medical opinion if the opinion is inconsistent with the opinion of a

consulting physician or when the treating physician's opinion is internally inconsistent, as long as he minimally articulated his reasons for crediting or rejecting evidence of disability.") (internal citations omitted).

The ALJ's conclusion regarding Adkins's RFC is not the only conclusion that can be drawn from the evidence. A reasonable person could have found that the evidence supported a more or less restrictive RFC. Though reasonable minds may differ, that does not mean the ALJ's conclusions were unreasonable. The ALJ adequately supported his decision with substantial evidence in the record and demonstrated why he found some evidence more credible than others. I will not reweigh the evidence on review or substitute my judgment for that of the ALJ's when there is – like in this case – substantial evidence to support it.

Having construed Adkins's RFC, the ALJ determined at Step Four that Adkins was able to perform past relevant work as a paint collator during the closed period. (R. 19-20.) The SSA's regulations require the ALJ to consider the claimant's work experience during the past 15 years and evaluate whether the claimant was able to perform any such work during the period of claimed disability. 20 C.F.R. § 404.1565, 416.965. During the first hearing, when Adkins was unemployed, the VE testified that someone with Adkins's RFC limitations could not perform any of Adkins's past relevant work. (R. 277.) The VE explained that Adkins's previous jobs required constant reaching and handling and two-handed activities, which would be prohibited for someone with Adkins's limitations. (R. 278.) By the second hearing, Adkins had been employed for several months as a paint collator. The ALJ then amended Adkins's past relevant experience to include this new job and concluded that Adkins could have worked as a paint collator during the closed period. (R. 19-20.)

It is not clear why a job acquired *after* a claimed disability period would count as *past* work experience for determining whether or not an applicant was disabled during that period. Regardless, the ALJ concluded at Step Five that a substantial number of jobs existed in the national economy for someone with Adkins's RFC, age, education and work experience.  (R. 20-21.)  The ALJ presented these limitations to the VE at the first hearing and the VE identified three occupational categories with over 800 jobs in Adkins's local area that Adkins would be able to perform.  The VE testified that there may not be any jobs in the national economy for someone possessing the more stringent limitations stated in Dr. Rahn's letter.  However, the ALJ had discredited Dr. Rahn's recommendations for reasons stated above.

### III.  CONCLUSION

The ALJ provided legitimate reasons for his decision, demonstrated consideration of all the medical and non-medical evidence in the record, and adequately explained why he weighed some evidence more favorably than others.  Although a reasonable person could come to different conclusion regarding Adkins's claim, the ALJ's conclusions are supported by substantial evidence. Therefore, the Court **AFFIRMS** the judgment of the Administrative Law Judge that Adkins was not disabled from October 1, 2000 through May 31, 2005.

**SO ORDERED**.

ENTERED: June 13, 2008

 s/ Philip P. Simon  
PHILIP P. SIMON, JUDGE  
UNITED STATES DISTRICT COURT